IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

BONNIE NORMAN, Individually and On                        PLAINTIFF
Behalf of All Others Similarly Situated

vs.                        No. 4:20-cv-492-DPM

INDEPENDENT CASE MANAGEMENT, INC.                        DEFENDANT

**BRIEF IN SUPPORT OF MOTION TO DECERTIFY**

## I.     <u>Introduction</u>.

Named plaintiff Bonnie Norman, a former employee of defendant Independent Case Management, Inc. ("ICM") was a Direct Support Professional ("DSP") who worked with one customer in Harrison.  She also worked for a separate company that provided different services to the same client and had a "side agreement" to do work for the family.  Norman claims ICM violated the Fair Labor Standards Act ("FLSA") by not paying her overtime, including in situations where she felt a "moral obligation" to stay with the client after her work shift ended despite the fact the client's mother/guardian was present.  Norman worked as many hours as she thought were needed, regardless of any schedule set by ICM.

On March 11, 2021, the Court conditionally certified a collective of "[a]ll direct support professionals employed by Independent Case Management who worked more than forty hours in any week from 11 May 2017 to 11 May 2020."  ECF Doc. 26. Plaintiff subsequently mailed notices of this action to current and former DSPs of ICM.  ICM then conducted limited written discovery and deposed some of the consent plaintiffs.

2420652-v1

Based on the more fully developed record, plaintiff and those DSPs who consented to join the collective cannot meet the higher and stricter burden for maintaining this case as a collective action. The members of the conditionally-certified collective are not "similarly situated" for a variety of reasons. First, the nature of the overtime claims varied from person to person – some claimed a generic refusal to pay overtime for specific periods of time; others claimed a more hit-or-miss failure to pay overtime; and others (those in parental roles) claimed they should have been paid for all waking hours or even around-the-clock for being a mom or dad.

Second, the members of the collective had significantly different work environments, work demands, and work schedules – some worked in their own homes if the client lived with them, while others worked at their clients' homes. They reported to different managers. Some worked with just one client, while others worked with multiple clients. Some DSPs were full-time, and some were decidedly part-time. And the level of care for each client varied greatly based on the client's individualized plan of care.

Third, some members of the collective simultaneously worked for an additional employer or employers, complicating the analysis of when they were working for ICM (and whether they crossed into overtime for a particular week) and when they were working for someone else. Some of those additional employers provided in-home services to the very same client. Norman herself worked for three different employers to provide services to her one client – ICM, another in-home provider for her client and the client's mother.

2

Fourth, some members of the collective had no family relationship to the client, while others were parents or siblings.  This also complicates the analysis of determining when those members of the collective were actually working for ICM and when they were providing natural support, the type of support one would expect any parent or family member to provide.

In addition to these key dissimilarities, there are individualized defenses as to the claims of certain collective members, such as some plaintiffs not recalling working more than forty hours in any week and not recording or informing ICM of work performed beyond their normal schedule, and some testifying they did not receive overtime when their payroll records show otherwise (a credibility issue).  Further, the calculation of damages for members of the collective would require a highly individualized inquiry into each member's time spent working in excess of forty hours in any given week; part of that calculation would involve a) differentiating between work for ICM and other providers, and b) distinguishing between the natural support a parent is expected to provide and specific work performed as an ICM employee.

Norman and the consent plaintiffs have failed to meet their stricter second stage burden for maintaining this case as a collective action.  Accordingly, the Court should decertify the collective and dismiss the claims of the consent plaintiffs.

## II.    Summary of Relevant Facts.

After taking the depositions of named plaintiff Norman and an early consent plaintiff (Emma Ross), ICM selected ten additional consent plaintiffs to depose.  Due

2420652-v1

to some refusing to go forward (including a few who simply did not show up for their noticed depositions), ICM selected five additional consent plaintiffs to depose. Of the fifteen consent plaintiffs ICM selected, only five showed up for their depositions. But even among the five who were deposed and the depositions of Norman and Ross, it is clear that significant differences exist regarding the nature of their claims and the underlying circumstances of their employment.

A. **Named Plaintiff Bonnie Norman.**

Norman claims that ICM never provided enough staff to care for her client, and did not pay her fully for the hours she had to work to cover the client's needs. *See* Ex. 1 (Norman dep. at 13-14, 19). Noman started working for ICM in 2016. *See* Ex. 1 (Norman dep. at 16). In addition to working for ICM, Norman began working in 2018 for a different company (Better Home Care) that provided personal care services to the same client and had another agreement with the client's mother to help around the house, including doing grocery shopping. *See* Ex. 1 (Norman dep. at 33-34, 54-56, 78-79, 90-91); Doc. 21-2, ¶ 9.d). Importantly, Norman could not distinguish between the personal care she provided to the client as an employee of Better Home Care and the work she did as an employee of ICM. *See* Ex. 1 (Norman dep. at 56-57, 65-66, 108-109).

Unknown to ICM, Norman started living with her client in 2018; she got her mail there, brought in her clothing and some pots and pans, and her two dogs. *See* Ex. 1 (Norman dep. at 24, 29-30). The client's mother and brother lived there, too, although she questioned their ability and willingness to care for the client. *See* Ex. 1

(Norman dep. at 26, 85-86).  No one (including ICM) told Norman to move in with the client, or to work twenty-four hours a day.  *See* Ex. 1 (Norman dep. at 26, 42-43).  ICM did not learn of Norman's move until much later -- ICM disciplined her in June 2019 for not getting approval for overtime and working when not scheduled; ICM also told her to leave the home when not scheduled to work.  *See* Ex. 1 (Norman dep. at 87-89); Doc. 21-2, ¶ 9.b.

However, Norman did not leave when her scheduled shift ended because she "cared about the client enough not to want to leave them helpless."  *See* Ex. 1 (Norman dep. at 45-46).[1]  She also believed that she could not leave her client, despite ICM telling her to go home when she was not scheduled to work.  *See* Ex. 1 (Norman dep. at 25, 89).  When asked to explain why she did not leave when her shift was over, Norman stated that she does "what God tells me."  *See* Ex. 1 (Norman dep. at 89); Doc. 21-2, ¶ 9.b.  No one directed Norman to stay past her scheduled shifts – she decided to do it on her own.  *See* Ex. 1 (Norman dep. at 100).  Norman worked as many hours as she thought were needed, regardless of the schedule set by ICM.  *See* Ex. 1 (Norman dep. at 112-113).

Norman testified that she was told that she could only claim 40 hours a week, and that she would be written up if she claimed more.  *See* Ex. 1 (Norman dep. at 20-21, 96).  Yet, she admits she recorded overtime hours "when they allowed me" and that she was paid a lot of overtime hours in 2017 and 2018. *See* Ex. 1 (Norman dep.

---

[1] Norman later told her supervisor shortly before ICM terminated her employment that she felt responsible for the entire family's well-being, not just the well-being of the client.  Doc. 21-2, ¶ 9.b.

2420652-v1

at 21-22, 82, 96).  She did not record any overtime during the first part of 2019, but started recording it when other staff did not show up for their shifts and ICM asked her to cover those shifts.  *See* Ex. 1 (Norman dep. at 75-76, 96-97).  Her work schedule was "all over the place" in 2019.  *See* Ex. 1 (Norman dep. at 75-76).  Norman does not claim that she should be paid for any time when other staff were present.  *See* Ex. 1 (Norman dep. at 40-41).

###   B.   Consent Plaintiff Amanda Hunter.

Hunter is a current employee of ICM.  She has worked for ICM taking care of a sibling, who lives in the same home, since 2010.  *See* Ex. 2 (Hunter dep. at 10-12).  According to Hunter, she works forty hours a week, and there are no other service providers involved with her sibling's care.   *See* Ex. 2 (Hunter dep. at 13-15).  Hunter has always been paid for the work time she recorded using a phone app.  She has had situations in which she was late submitting her time; in those situations, she was paid the following pay period.  *See* Ex. 2 (Hunter dep. at 19-20).

And Hunter admittedly is a bit confused – she testified that she has no claim against ICM for unpaid overtime because she has never worked overtime.  *See* Ex. 2 (Hunter dep. at 15-16).  No one at ICM has directed her to work overtime.  *See* Ex. 2 (Hunter dep. at 19).  When Hunter received her notice of the collective action in the mail, she called plaintiffs' counsel's office to ask about the consent form and whether she needed to sign it.  Plaintiffs' counsel's office told her to sign it and return it.  She did, but she did not understand that she was signing on to be a plaintiff in this action.  *See* Ex. 2 (Hunter dep. at 15-16, 22-23).

C.     **Consent Plaintiff Tonya Hargan.**

Hargan worked for ICM for three months – January 2020 through March 2020. *See* Ex. 3 (Hargan dep. at 8, 11).  Hargan's overtime claims involved work with one client, whom she helped shower and get dressed, took shopping, and assisted with learning skills. *See* Ex. 3 (Hargan dep. at 13, 19-21).  She clocked in by using her phone, and had no reason to believe ICM's time system recorded her time inaccurately.  She could also correct a time entry if needed.  *See* Ex. 3 (Hargan dep. at 26-27, 36, 40).  No one ever told her to work off-the-clock, and she never discussed overtime with her supervisor.  *See* Ex. 3 (Hargan dep. at 41).

Hargan's main complaint is that she was not paid for an emergency situation in which she spent the night with the client due to the client's mother being admitted to the hospital.[2]  *See* Ex. 3 (Hargan dep. at 8-9).  Hargan's supervisor told her if the client woke up during the night, Hargan would be paid for that time.  *See* Ex. 3 (Hargan dep. at 23-25).  However, the client slept through the night (8:30 pm to 7:15 am).  *See* Ex. 3 (Hargan dep. at 9, 25).  Hargan also claims there were times when the client's mother would be late getting home from work.  *See* Ex. 3 (Hargan dep. at 11-12).  Hargan's normal schedule was Monday through Friday, 7 am to 5:30 pm.  *See* Ex. 3 (Hargan dep. at 8, 21).  She thinks the client's mother came home late three times.  *See* Ex. 3 (Hargan dep. at 21).  However, some days Hargan took off early for a variety of personal reasons.  *See* Ex. 3 (Hargan dep. at (33-35).

---

[2] Hargan did not live in the client's home. *See* Ex. 3 (Hargan dep. at 12).

Hargan finally claims that she was never paid overtime. *See* Ex. 3 (Hargan dep. at 11, 23). However, her pay records indicate otherwise; in fact, she was paid overtime over the course of her three-month work tenure. *See* Ex. 4 (Rogers decl., att. ¶ G). When asked about the discrepancy between her pay records and her memory, Hargan stated "apparently I wasn't paying much attention" to her paystubs, even though she previously testified that she in fact reviewed her pay stubs for accuracy. *See* Ex. 3 (Hargan dep. at 33, 40). Hargan never asked her supervisor about the alleged unpaid overtime she felt she was owed. *See* Ex. 3 (Hargan dep. at 41).

D.     **Consent Plaintiff Amy Walker.**

Walker worked for ICM from late 2017 until July 2020. *See* Ex. 5 (Walker dep. at 9, 12). While working for ICM, she also held a full-time job for United Cerebral Palsy (UCP), where she worked as the office manager (10 am to 4 pm, Monday through Friday, and on some weekends). *See* Ex. 5 (Walker dep. at 9-11).

Walker's client was non-verbal, bedridden and in need of 24/7 care. The client's care included spoon-feeding, diaper changes, rotating the client while in bed, and helping dress the client. *See* Ex. 5 (Walker dep. at 13-14, 22-23). Walker worked mostly one-on-one with the client (although other staff from home health would sometimes come in), and she did not live at the client's home. *See* Ex. 5 (Walker dep. at 13-15). Initially, Walker worked the 4 pm to midnight shift Monday through Friday, but then switched (about eight months before she left ICM) to the midnight to 6 am shift seven days a week. *See* Ex. 5 (Walker dep. at 15-17).

In 2019, Walker's supervisor told her and the other DSPs working with the client that they would need prior approval to work overtime. Walker and the other DSPs pushed back on this because the client needed 24/7 care. The supervisor ultimately told them to record all of their time, saying, "Y'all just do whatever y'all have to do." Walker in fact recorded all of her time and got paid for it. *See* Ex. 5 (Walker dep. at 21, 29-30).

Walker's claim is limited to the last four months she worked for ICM (April through July 2020). She claims she was not paid for the overtime hours she worked. *See* Ex. 5 (Walker dep. at 18-22). This "change" occurred after her supervisor was replaced in 2020.[3] *See* Ex. 5 (Walker dep. at 21). However, Walker's records show her being paid overtime on numerous occasions during the last four months of her employment. *See* Ex. 4 (Rogers decl., att. A). Walker conceded she was paid overtime in 2018 and 2019, and her pay records reflect that she was paid a considerable amount of overtime wages. *See* Ex. 4 (Rogers decl., att. A); Ex. 5 (Walker dep. at 19-20).

### E.   Consent Plaintiff Katregna Berry.

Berry began working for ICM six years ago. *See* Ex. 6 (Berry dep. at 9-10). Berry has been employed to care for her own adult child for the last three-to-four years, and it is her full-time, forty-hour a week job. *See* Ex. 6 (Berry dep. at 11-13, 16-17). She describes her job as entailing the same type of day-to-day duties she

---

[3] Walker testified that the client's father used money from the client's trust to pay her for the hours worked not compensated by ICM and 1099'd the amount. *See* Ex. 5 (Walker dep. at 19, 27-28).

would have fulfilled as the client's mother, even if she had she never gone to work for ICM – *e.g.*, working on her adult child's range of motion and hand/eye coordination, and taking trips to places like Walmart and the grocery store. *See* Ex. 6 (Berry dep. at 13-15, 22-23). According to Berry, there is nothing ICM asks her to do for her client/adult child that she would not otherwise do as a parent. *See* Ex. 6 (Berry dep. at 28).

Berry's client/adult child currently needs 24/7 care, and other family members (Berry's daughter and Berry's mother) also are employed by ICM to help care for the client.[4] *See* Ex. 6 (Berry dep. at 15-18). ICM pays the daughter to care for the client from 4 pm to midnight, Monday through Thursday, and 7 am to 1 pm on Friday. ICM pays Berry's mother (the client's grandmother) to care for the client from Friday at 1 pm through Sunday. *See* Ex. 6 (Berry dep. at 16-17).

Berry records her time on her phone. *See* Ex. 6 (Berry dep. at 27). When Berry records her time, she gets paid for it. *See* Ex. 6 (Berry dep. at 29). Berry's primary claim is simple – she should be paid for any time she cares for her client/adult child at night (midnight to 6 am). *See* Ex. 6 (Berry dep. at 18-19, 42-43). Berry also mentioned that at times, her daughter is unable to cover her assigned shift with the client, and Berry's mother is not able to cover it, either. *See* Ex. 6 (Berry dep. at 18-19, 45-46). However, Berry does not record her time on those occasions and has not talked to her supervisor about this time. *See* Ex. 6 (Berry dep. at 46-47). Berry does

---

[4] Berry's child was not always provided 24/7 care under the plan of care. At one point, the plan of care called for thirty hours of care per week. *See* Ex. 6 (Berry dep. at 38-40).

not have a sense for how much overtime she believes she is owed.  *See* Ex. 6 (Berry dep. at 41).

ICM paid Berry overtime when she worked in the field with clients other than her child.[5]  *See* Ex. 6 (Berry dep. at 30-31).  Because she simultaneously worked for another provider to provide services for two clients (both of whom lived together in the same house), figuring out how to split the time "was kind of complicated."  *See* Ex. 6 (Berry dep. at 33-34).  At one point, ICM sought to limit her work hours to forty per week while working in the field, but was unable to do so because ICM did not have sufficient staff to cover the shifts needed – so ICM paid her overtime.  *See* Ex. 6 (Berry dep. at 31, 35).

## F.    <u>Consent Plaintiff Starletta Biggs.</u>

Biggs began working for ICM in 2011.  *See* Ex. 7 (Biggs dep. at 13).  She took the job to help her mother take care of her half-sibling, and claims ICM asked her and her mother to "work for free" taking care of her half-sibling.[6]  *See* Ex. 7 (Biggs dep. at 10-11, 13-14, 49).  Her half-sibling (ICM's client) lives in a trailer 500 feet from Biggs' home; the family moved the client to the trailer several years ago because "it's illegal to have someone who does not live with that person to not be paid to work with that person."  *See* Ex. 7 (Biggs dep. at 14-15).  Family members mainly take care

---

[5] When Berry began caring for her own child as an ICM employee, ICM told her she was limited to forty hours a week with no overtime.  *See* Ex. 6 (Berry dep. at 35-36).

[6] Biggs' mother has provided personal care services to the client through another provider.  *See* Ex. 7 (Biggs dep. at 22-23).

of the client because "we just had horrible luck with [non-family] staff members." *See* Ex. 7 (Biggs dep. at 15).

Biggs' job duties include maintaining a safe environment for her half-sibling, cooking and cleaning, helping with laundry and assisting with showering. Most of their time is spent watching movies. *See* Ex. 7 (Biggs dep. at 17-19). She currently works a rotating schedule -- Monday through Sunday, 6 pm to 2 am, for a week, and then Monday through Sunday, 6 pm to 8 am, the following week. *See* Ex. 7 (Biggs dep. at 19). She claims to work around one-hundred and forty hours every two weeks; she believes she is paid for all that time, including overtime. *See* Ex. 7 (Biggs dep. at 39-41, 44-45).

Biggs testified that she was forced to provide "natural support" to her half-sibling by a supervisor at some point in September or October of 2019 or 2020, totaling about 14 hours a week.[7] *See* Ex. 7 (Biggs dep. at 15, 29, 31-34, 45-47). Apart from being told to provide natural support to her half-sibling, Biggs has recorded and been paid for her work. *See* Ex. 7 (Biggs dep. at 46-47). Her current supervisor has never asked her to work off-the-clock. *See* Ex. 7 (Biggs dep. at 48).

G. **Consent Plaintiff Emma Ross.**

Ross currently works for ICM. *See* Ex. 8 (Ross dep. at 8, 21-22). Ross' client is her adult child, who has always lived with her. *See* Ex. 8 (Ross dep. at 10-12, 15-16). Her scheduled work time is Monday through Friday, 8 am to 1 pm, Saturday, 8 am

---

[7] Biggs claims she was not paid for hours worked 10 am to midnight on Fridays "[b]ecause we were only allowed 40 hours a week, two days straight, minus the four hours for senior care. That's 20 hours a day. So I think it was just Friday from 10 am to midnight that I never got paid." *See* Ex. 7 (Biggs dep. at 29-30).

to 3 pm, and Sunday, 8 am to 4 pm.  *See* Ex. 8 (Ross dep. at 12).  However, Ross claims she works one-hundred hours per week with her child and is entitled to be paid for that time.  *See* Ex. 8 (Ross dep. at 10-12).  As Ross put it:

> A:   Well, I worked -- my schedule is eight to one, and from one on I'm
>       still working with my client.  I'm still caring for my client.
>
> Q:   For your son, right?
>
> A:   Yes.
>
> Q:   Because he's your only client, right?
>
> A:   Yes.

*See* Ex. 8 (Ross dep. at 12).  That work continues "until bedtime" seven days a week. *See* Ex. 8 (Ross dep. at 13).  In all, she is claiming 24 hours a day because "my client, my [child], needs care and supervision 24 hours a day."  *See* Ex. 8 (Ross dep. at 13-14, 25-26).  Ross claims she asked for overtime, but "years ago they told me overtime was not in [her adult child's] plan, that they did not pay overtime.  They did not pay overtime for holiday days, or anything like that."  *See* Ex. 8 (Ross dep. at 35).

ICM offered to place an outside DSP in her home in 2020, but Ross told ICM "I didn't need a person."  She also testified that she did not want any outsiders in her home due to COVID.  *See* Ex. 8 (Ross dep. at 37-39).  However, when Ross worked part-time for Burger King in 2020, a neighbor stayed with her child.  *See* Ex. 8 (Ross dep. at 7-8, 74-75, 80-83).

Ross presently clocks-in using an app on phone; in the past, she used to call in her hours worked by phone.  *See* Ex. 8 (Ross dep. at 44-45).  She has not used the system to claim any additional hours above-and-beyond her scheduled hours.  *See* Ex.

13

8 (Ross dep. at 47-48). She has never recorded more than 40 hours of work per week. *See* Ex. 8 (Ross dep. at 53).

**H.  Written Discovery Responses of and Facts Concerning Other Consent Plaintiffs.**

• Consent plaintiff Elizabeth Gomez worked as a DSP in the Spring of 2019. During her first ICM pay period, she recorded a total of 27.25 hours and received no overtime. During her second and final pay period, ICM paid her for 40 hours of regular work and eight hours of overtime work. *See* Ex. 4 (Rogers decl., att. B).

• Consent plaintiff Cassandra Wright stated in her response to interrogatories that she "was usually scheduled for about 40 [hours] per week, and I often stayed over hours of my shift to help another employee. There were times that I wasn't paid all of my wages." *See* Ex. 9 (Wright response to Interrogatory No. 5). Wright, who worked until mid-September 2017, received overtime pay on all but four of her 2017 paychecks. *See* Ex. 4 (Rogers decl. ¶ att. C).

• Consent plaintiff Jasmine Lemons typically worked less than 50 hours per two-week pay period, and only worked overtime during one pay period in 2018 and 2019. Her client (with whom she did not live) attended a classroom-like setting during the week. *See* Ex. 4 (Rogers decl. ¶ 9, att. D).

• Consent plaintiff Veronica Tucker worked for ICM from September 2017 to September 2019. She claims she did not "get any lunches or any breaks and was paid for fewer hours than actually worked. I wasn't paid overtime or paid for extra hours." *See* Ex. 10 (Tucker response to Interrogatory No. 5). She was also a home

care health worker during this same time period for a home health care provider (PALCO). *See* Ex. 10 (Tucker response to Interrogatory No. 8). The overtime she worked in 2017 and 2018 was hit-or-miss, but concentrated. For instance, 31.5 of her 39.5 hours of overtime in 2017 was for one pay period; out of 43.48 hours of overtime in 2018, 36.25 hours of overtime was worked in two consecutive pay periods in February. In most two-week pay periods in 2017, 2018 and 2019, she recorded less than 70 hours. *See* Ex. 4 (Rogers decl., att. F).

- Consent plaintiff Tenika Nixon claimed "I usually worked approximately 40 hours per week, and I was only paid for approximately 30 hours per week. I was not getting paid mileage for taking my patient wherever he needed to go." *See* Ex. 11 (Nixon response to Interrogatory No. 5). However, her pay records show her consistently being paid for 40 hours except for her last two pay periods. *See* Ex. 4 (Rogers decl. ¶ 9, att. E).

## III.   <u>Argument</u>.

### A.   <u>Plaintiffs' Second Stage Burden in Collective Action Cases</u>.

The fundamental question in determining whether a collective action under §216(b) of the FLSA is appropriate is straightforward – whether or not the named and opt-in plaintiffs are "similarly situated." *Hamilton v. Diversicare Leasing Corp.*, Civil No. 1:12-cv-1069, 2014 WL 4955799, at *2 (W.D. Ark. Oct. 1, 2014) (citing *Smith v. Heartland Auto. Servs., Inc.,* 404 F. Supp. 2d 1144, 1149 (D. Minn. 2005)). "To avoid decertification, the named plaintiffs must introduce 'substantial evidence' that

the opt-in plaintiffs are similarly situated." *White v. Baptist Mem. Health Care Corp.*, No. 08-cv-02478 SMH, 2011 WL 1883959, at *4 (W.D. Tenn. May 17, 2011)).

Courts in the Eastern District of Arkansas follow a two-stage certification process. *See Wright v. Pulaski Cnty.*, Case No. 4:09CV00065, 2010 WL 3328015, at *9 n.10 (E.D. Ark. Aug. 24, 2010) (decertifying collective). In the first stage, the court engages in a preliminary analysis of whether plaintiffs are similarly situated. *Id.* If the court finds that the plaintiffs are similarly situated, which can be based upon "minimal evidence," it may conditionally certify the class. *Id.* "[A]t the initial conditional-certification stage, the plaintiffs' burden is not rigorous; they must only show that there is a 'colorable basis for their claim' and 'that a class of similarly situated plaintiffs exists.'" *Douglas v. First Student, Inc.*, 888 F. Supp. 2d 929, 933 (E.D. Ark. 2012)

The second stage analysis occurs after discovery is complete. *See Heartland Auto. Servs., Inc.,* 404 F. Supp. 2d at 1149–50. The court again makes a factual determination as to whether the class is similarly situated, but the plaintiffs' burden is stricter. *See Douglas*, 888 F. Supp. 2d at 933. And the similarities required to sustain a collective action "must extend beyond the mere facts of job duties and pay provisions." *Burch v. Qwest Communications Intern., Inc.*, 677 F. Supp.2d 1101, 1114 (D. Minn. 2009) (citing *Anderson v. Cagle's, Inc.*, 488 F.3d 945, 953 (11th Cir. 2007) (representative testimony was not appropriate as to all but one type of claim due to widely varying allegations).

16

Ultimately, a collective action proceeds to trial "only if the employees are similarly situated. And that depends on the facts surrounding the employees' claims, [ICM's] available defenses, and whether a group trial would be fair and manageable." *Love v. Retzer, LLC, et al.,* Case No. 5:13-cv-292-DPM (E.D. Ark. Oct. 23, 2015), ECF Doc. 148. Simply claiming violations of the FLSA is not enough to avoid decertification; even proof of employees working off-the-clock is not enough. *Id.* (although the record showed many instances of employees working uncompensated hours, the circumstances varied widely and there was insufficient similarity between them to support continuing forward collectively). "The essential question is whether the difference among the plaintiffs outweigh the similarities of the practices to which they were allegedly subjected." *Douglas*, 888 F. Supp. 2d at 933 (citing *White*, 2011 WL 1883959, at *4). If "the action relates to specific circumstances personal to the plaintiff rather than any generally applicable policy or practice," then decertification is proper. *Proctor v. Allsups Convenience Stores, Inc.*, 250 F.R.D. 278, 280 (N.D. Texas 2008).

**B.** **The Court Should Decertify the Collective; Plaintiffs Cannot Meet Their Second Stage Burden Due to Disparate Legal Claims and Fact Settings.**

1.   *Stark differences exist in the claims and the basic facts underlying plaintiffs' employment settings.*

When the types of claims and circumstances surrounding those claims vary widely, plaintiffs seeking to maintain a collective face a steep, uphill battle. *See Love v. Retzer, LLC, et al.,* Case No. 5:13-cv-292-DPM (E.D. Ark. Oct. 23, 2015), ECF Doc.

148; *Burch*, 677 F. Supp. 2d at 1122 (certifying single type of claim under the second stage analysis – time spent booting up/shutting down computers – but finding the remaining allegations represented a "hodgepodge of other uncompensated activities" that were not conducive to a collective action).  Material differences in duties and responsibilities also suggest that plaintiffs are not similarly situated. *Freeman v. Wal-Mart Stores, Inc.*, 256 F. Supp. 2d 941, 945 (W.D. Ark. 2003).

Additionally, when individualized inquiries are needed to determine the issues central to the question of liability, "treatment of plaintiffs' claims on a collective basis is inappropriate." *Douglas*, 888 F. Supp. 2d at 934 (collecting cases). In light of this, courts often decertify collectives due to factual dissimilarity amongst employee settings. *See, e.g.*, *Love v. Retzer, LLC, et al.,* Case No. 5:13-cv-292-DPM (E.D. Ark. Oct. 23, 2015), ECF Doc. 148 (decertifying a conditionally-certified class; although the record showed many instances of employees working uncompensated hours, the circumstances varied widely and there was insufficient similarity between them to support continuing forward collectively); *Teramura, et al. v. Walgreen Co.,* Case No. 5:12-cv-05244-JLH (W.D. Ark. Jun. 18, 2014), ECF Doc. 284 (decertifying a conditionally-certified class because the material dissimilarities among the plaintiffs, including their job duties, experience, alleged work hours, and claims and defenses to their claims could not be fairly and efficiently adjudicated on a collective basis).

Here, the disparate legal claims and factual settings among the plaintiffs demonstrate that the conditional collective is not similarly situated.  First, various types of claims were asserted by those plaintiffs who were deposed or who responded

18

to written discovery – some alleged they should have been paid 24 hours a day, seven days a week.  *See* Ex. 8 (Ross dep. at 13-14, 25-26).  Others alleged they were not paid for specific blocks of time.  *See* Ex. 7 (Biggs dep. at 29-30, 32-34, 46-47); Ex. 10 (Tucker responses to Interrogatory No. 5).  Others expressed hit-of-miss type complaints regarding covering shifts for others or having to stay late on a shift.  *See* Ex. 3 (Hargan dep. at 8-9, 11-12); Ex. 6 (Berry dep. at 18-19, 45-46).  And one testified she had no claim against ICM because she never worked overtime.  *See* Ex. 2 (Hunter dep. at 15-16).

Further, plaintiffs' day-to-day job duties varied widely, and this was not solely due to the fact that those duties were provided at the clients' homes located throughout the state (some in remote locations).  Doc. 21-1, ¶¶ 3, 7.  Some plaintiffs worked with other ICM staff or separate home health care staff, while others worked alone; and some plaintiffs worked on physical (such as range-of-motion) and social skills, while others provided more intensive types of care like spoon-feeding, diaper changes and rotating the client while in bed.  *See* Ex. 5 (Walker dep. at 13-14, 22-23); Ex. 6 (Berry dep. at 13-15, 22-23).  One consent plaintiff testified that she primarily watched movies with her client.  *See* Ex. 7 (Biggs dep. at 17-19).

Finally, some consent plaintiffs were related to and lived with their clients and would have cared for their clients in the exact same way regardless of being employed by ICM, while others were not related to their clients.  *See* Ex. 3 (Hargan dep. at 8-9, 12); Ex. 6 (Berry dep. at 13-15, 22-23, 28).  Norman is unique in this sense – she was not related to her client and did not live with her client and the client's family at first.

2420652-v1

She later moved in and brought her dogs with her. When Norman's supervisor told her not to be at the home when she was off-duty, Norman told the supervisor that she "would do what God tells [her] to do." *See* Ex. 1 (Norman dep. at 24-25, 30, 89-90). Norman also told the supervisor that "she felt a moral obligation to stay with the client after her shift ended and that she felt responsible for the entire family's wellbeing." Doc. 21-2 at 4, ¶ 9(b); *see also* Ex. 1 (Norman dep. at 45, 89-90). Norman worked as many hours as she thought were needed, regardless of the schedule set by ICM. *See* Ex. 1 (Norman dep. at 100, 112-113).

Because of the significantly different claims and employment settings found among the various plaintiffs, numerous individualized inquires would be required to proceed forward collectively. This case should not proceed as a collective action given the more fully developed record. *See Douglas*, 888 F. Supp. 2d at 934 (important distinctions in the factual circumstances of the plaintiffs' employment existed and would "require a highly individualized inquiry as to each class member's circumstances every day of every week."); *Wright*, 2010 WL 3328015, at *9 (decertification appropriate due in part to the fact "plaintiffs individual experiences . . . vary from shift to shift and day to day" requiring "significant individualized inquiry"); *Espenscheid v. DirectSat USA, LLC*, No. 09–cv–625–BBC, 2011 WL 2009967, *5 (decertification by the court on the eve of trial due to "divergent testimony, distinct theories of liability and unique employment environments and experiences").

> 2.    *ICM's individual defenses to the claims raised by members of the collective also prevent them from establishing they are similarly situated.*

"The individualized defenses factor assesses whether potential defenses pertain to the plaintiff class or whether the potential defenses require proof of individualized facts at trial." *Drake v. Steak N Shake Operations, Inc.*, 286 F. Supp. 3d 1040, 1047 (E.D. Mo. 2017) (quoting *Butler v. Direct SAT USA, LLC*, 47 F. Supp. 3d 300, 313 (D. Md. 2014)) (internal citations and quotations omitted). "Disparate individual defenses heighten the individuality of claims, and requiring the defendant to raise these arguments in a [collective] action suit undermines its ability to mount a clear and coherent defense to the case." *King v. West Corp.*, Case No. 8:04-cv-318, 2006 WL 118577, at *15 (D. Neb. Jan. 13, 2006) (commenting on "case-by-case examinations of whether the employees truly worked 'off-the-clock' and at home as some allege, whether such work would fall within a *de minimis* exemption under the FLSA, whether the employee actually worked more than forty hours a week").

When there is a defense to liability to individual plaintiffs, the individualized defenses factor weighs in favor of decertification. *See Douglas*, 888 F. Supp. 2d at 935−36 (decertifying the conditionally-certified class in part because of the individualized issues related to liability including testimony from some opt-in plaintiffs that proved the defendant was not liable under the FLSA); *Hamilton*, 2014 WL 4955799, at *5 (decertifying the conditionally-certified class in part because "[i]n addition to [the defendant's] defense that the policy of automatically deducting meal breaks is compliant with the FLSA, [defendant] has defenses regarding actual

liability as to individual plaintiffs," including whether supervisors were on notice of unpaid time).  In *Douglas*, the court specifically noted the existence of some defenses that applied to some but not all of the members of the collective:

> For example, one Opt-in plaintiff testified he was paid for all the hours he worked. Other Opt-in plaintiffs testified they never worked more than forty hours in a week. As to these individuals, First Student has no liability under the FLSA in light of their testimony in this case. See, e.g., *936 *Camesi v. University of Pittsburgh Medical Center*, 2011 WL 6372873, at *9, 2011 U.S. Dist. LEXIS 146067, at *27–28 (W.D.Pa. Dec. 20, 2011) (decertifying the conditionally-certified FLSA class in light of defendant's individualized defenses which included "whether individual plaintiffs actually worked overtime without compensation.").

*Douglas*, 888 F. Supp. 2d at 935-936.

The situation that existed in *Douglas* exists in this case.  For instance, consent plaintiff Amanda Hunter testified that she has always been paid for the work time she recorded and that she has never worked overtime.  *See* Ex. 2 (Hunter dep. at 15-16, 19-20).  Other consent plaintiffs claimed to have worked without compensation, but admittedly never told management at ICM or even recorded the time.  For instance, consent plaintiff Katregna Berry never reported (and never said anything to her supervisor) about the uncompensated time she is claiming – caring for her child at night and covering shifts when her daughter and mother (who also work for ICM with the same client) are unable to work.  *See* Ex. 6 (Berry dep. at 46-47).

Another issue relates to the credibility of the plaintiffs' testimony.  Some of the consent plaintiffs claim they were not paid overtime or not paid for all time worked, even though ICM's pay records show otherwise.  *See, e.g.,* Ex. 3 (Hargan dep. at 11, 23, 33, 40); Ex. 4 (Rogers decl., ¶¶ A, E, G); Ex. 5 (Walker dep. at 18-22); Ex. 11 (Nixon

responses to Interrogatory No. 5). "Defendant[s] ha[ve] a right to attack the accuracy of testimony, particularly representative testimony." *White v. 14051 Manchester Inc.*, 301 F.R.D. 368, 377 (E.D. Mo. 2014); *see also Pacheco v. Boar's Head Provisions Co., Inc.*, 671 F. Supp. 2d 957, 964–65 (W.D. Mich. 2009) (noting that where the plaintiffs' allegations rested peculiarly on plaintiffs' credibility, the contradictions showed "the importance of cross-examination of each plaintiff" and suggested "the need for separate mini-trials to resolve each individual's claim") (internal quotation marks and citations omitted). Because of the individualized inquiry involved in credibility questioning and the distraction the questioning would pose to the underlying issues, this factor weighs in favor of decertification. *See White*, 301 F.R.D. at 377.

One final complicating factor worth noting – some plaintiffs worked for other agencies at the same time they worked for ICM, and provided services to the same clients. A significant issue at any trial will be determining when these plaintiffs (including Norman) were working for ICM and when they were working for someone else during any given work week. Norman again is unique – she worked for ICM, she worked for a personal care service, and she worked for the client's mother.[8] *See* Ex. 1 (Norman dep. at 33-34, 54-56, 78-79, 90-91); Doc. 21-2, ¶ 9.d. Norman also took it upon herself to "work" as many hours as she felt were needed, and felt a moral obligation to stay with the client and the client's family, which raises the defense to liability successfully made in *Rapp v. Network of Community Options, Inc.*, 3 F.4th

---

[8] And Norman could provide no meaningful distinction between the time spent working for ICM and the other provider. *See* Ex. 1 (Norman dep. at 56-57, 65-66, 108-109).

23

1084 (8th Cir. 2021), and raised in ICM's contemporaneously filed motion for summary judgment.

Because ICM has a variety of defenses that cannot be effectively asserted against representative plaintiffs, the collective must be decertified. *See King*, 2006 WL 118577, at *15 (collective action not warranted where individualized defenses would require case-by-case examinations of whether employees worked off-the-clock, whether the *de minimis* defense applied, and whether employees worked more than forty hours in any given week); *Douglas*, 888 F. Supp. 2d at 935 ("First Student has other individualized defenses which apply to some but not all of the members of the conditionally-certified FLSA class.").

> 3.   *Fairness and procedural concerns favor decertification.*

In analyzing fairness and procedural concerns, courts consider whether proceeding as a collective action "comports with the purposes of the FLSA by balancing the benefits of a reduction in the cost to individual plaintiffs, and any increased judicial utility that may result from the resolution of many claims in one proceeding, with the cost of any potential detriment to the defendant and the potential for judicial inefficiency that could stem from collective treatment." *Nerland v. Caribou Coffee Co.*, 564 F. Supp. 2d 1010, 1025 (D. Minn. 2007) (citing *Hoffman-La Roche Inc. v. Sperling*, 493 U.S. 165, 170 (1989) (ADEA claim)). "[C]oherent management of the trial" is an essential consideration. *Douglas*, 888 F. Supp. 2d at 936 (citing *Gatewood v. Koch Foods of Mississippi, LLC*, Case No. 3:07CV00082 KS–MTP, 2009 WL 8642001 (S.D. Miss. Oct. 20, 2009)). "[A] collective action is designed

to permit the presentation of evidence regarding certain representative plaintiffs that will serve as evidence for the class as a whole. It is oxymoronic to use [the collective action] device in a case where proof regarding each individual plaintiff is required to show liability." *Gatewood*, 2009 WL 8642001, at *20.

As discussed above, the claims in this case are a hodgepodge of allegations based in various locations around the state with very different underlying circumstances. As the court stated in *Douglas*:

> Each plaintiff's case requires consideration of different background facts and different testimony based each driver's work activities. Failing to decertify the conditionally-certified class will unfairly and prejudicially require First Student to prepare for and present hundreds of different trials simultaneously.

*Douglas*, 888 F. Supp. 2d at 936 (citing *King*, 2006 WL 118577, at *15) ("Disparate individual defenses heighten the individuality of claims, and requiring the defendant to raise these arguments in a [collective] action suit undermines its ability to mount a clear and coherent defense to the case."). This factor also weighs heavily in favor of decertification.

## IV.    Conclusion.

Norman and the consent plaintiffs cannot satisfy their burden of demonstrating they are "similarly situated" for the purpose of pursuing a collective action. Therefore, based on the more fully-developed record, the Court should decertify the conditionally-certified class and dismiss the claims of the consent plaintiffs.

2420652-v1

William Stuart Jackson (92189)
Regina A. Young (96161)
WRIGHT, LINDSEY & JENNINGS LLP
200 West Capitol Avenue, Suite 2300
Little Rock, Arkansas 72201-3699
(501) 371-0808 // FAX: (501) 376-9442
wjackson@wlj.com ; ryoung@wlj.com

*Attorneys for Defendant*

2420652-v1